## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION #:

**ALBERT BROWN O/K/A**
**FLOYD HAMILTON,**

    **Plaintiff,**

**v.**

**CITY OF BOSTON, PETER**
**O'MALLEY, & DOES 1-10,**

    **Defendants.**

### COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

### INTRODUCTION

1.    The Plaintiff, Albert Brown, otherwise known as Floyd Hamilton ("Mr. Hamilton"), brings this action against the above named and yet to be identified entities and individuals for violations of the Plaintiff's Federal and State Constitutional Rights under 42 U.S.C. §1983, individual liability for violations of Federal and State Constitutional Rights under 42 U.S.C. § 1983, conspiracy resulting in the deprivation of Federal and State Constitutional Rights, negligent hiring, training, and supervision, and negligent and intentional infliction of emotional distress.[1]

### PARTIES

2.    At all times relevant hereto, Mr. Hamilton was a resident of the City of Boston.

3.    At all times relevant hereto, Defendant City of Boston ("City of Boston") was a municipal entity under the laws of the Commonwealth of Massachusetts and the employer of the individual Defendants Peter J. O'Malley and Does 1 through 10.

4.    At all times relevant hereto, Defendant Peter J. O'Malley ("O'Malley") was a police officer

---

[1] Mr. Brown was referred to as Floyd Hamilton in all prior court proceedings relating to these charges. To remain consistent with the prior proceedings, Mr. Brown will continue to be referred to as Floyd Hamilton. *See Commonwealth v. Albert Brown OKA Floyd Hamilton*, Suffolk Superior Court, Docket No. 8484CR8883.

employed by the City of Boston with the Boston Police Department ("BPD"). He is being sued in his individual as well as official capacity as a police officer for the Defendant City of Boston.

5.      Defendants Does 1 through 10, whose identities are currently unknown, represent those employees of the BPD who supervised certain defendants in carrying out the policies of the Defendant City of Boston and/or had personal involvement in the investigation resulting in Mr. Hamilton's unlawful prosecution, conviction, and deprivation of his civil rights. Does 1 through 10 are sued in their individual capacities as well as official capacity as police officers for the Defendant City of Boston.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Hamilton's rights as secured by the United States Constitution and Massachusetts Declaration of Rights.

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  Mr. Hamilton invokes the pendant jurisdiction of the Court to hear and to decide claims under state law.

8.      Venue is proper in the District of Massachusetts under U.S.C. 28 U.S.C. § 1391(b), because this is the district in which the claims arose.

9.      Mr. Hamilton has complied with all conditions precedent to bringing this action.

## FACTS

10.      On May 23, 1984, Efrain DeJesus ("Efrain") was murdered inside 15 Nonquit Street in the Dorchester section in the city of Boston, Massachusetts.

11.      In August of 1984, Mr. Hamilton was indicted for murder in the first degree, armed robbery, and unlawfully carrying a shotgun.

12.     In May of 1987, trial on these three indictments commenced.[2]

13.     At trial, Benny DeJesus ("Benny"), Efrain's brother, served as the principal witness for the prosecution and was the sole witness to testify to Mr. Hamilton's alleged participation; he was on the stand for a day and a half. Benny lived with his brother at the time of the murder. He was not an eyewitness to the shooting. There was no forensic evidence introduced linking Mr. Hamilton to the murder or murder weapon.

14.     Benny testified that he lived on Nonquit Street with Efrain, who according to Benny, sold cocaine from this location. Benny testified that on May 23, 1984, he was returning to his home on Nonquit Street when he saw Mr. Hamilton's co-defendant Joseph Pope ("Pope") emerge from a van parked across the street from his house. Pope then allegedly approached him and asked for Efrain. Benny entered the home and told Efrain that Pope was looking for him. Benny allegedly then went upstairs to bathe his two minor children. Benny testified Efrain went downstairs and a few minutes later saw Efrain, Pope, and Mr. Hamilton headed toward Efrain's bedroom, and then passed by the bathroom to a small room Efrain allegedly used for cocaine distribution.

15.     Benny testified that he next allegedly heard footsteps of more than one person going back downstairs, and his brother saying "Oh no not this. You are going to have to shoot," and then heard a scuffle and gunshot. Benny testified that he began running out of the bathroom but was met by Pope, who put a revolver to his head and demanded he give him everything he had, allegedly robbing Benny of $14.00 and a small rock of cocaine. According to Benny's trial testimony, Mr. Hamilton came up the stairs with a shotgun in his hand, knelt on one knee and pointed the gun straight at Benny.

---

[2] This was the third trial on the indictments. At his first trial, Mr. Hamilton was tried jointly with co-Defendant, Joseph Pope, which resulted in a hung jury. Mr. Hamilton's second trial resulted in a mistrial.

16.     Benny made an in-court identification of Mr. Hamilton as the person who pointed the shotgun at him and testified "[w]hen I saw him upstairs I knew at that point that the person who was shot was my brother."[3]

17.     On May 26, 1987, Mr. Hamilton was convicted of first-degree murder and armed robbery out of Suffolk Superior Court and sentenced to a term of his natural life without the possibility of parole.[4]

18.     On October 24, 2022, the Honorable Judge Squires-Lee, issued a decision and memorandum granting Mr. Hamilton a new trial (the "October Decision") based on motions he filed in March and June of 2022.  The October Decision found that Mr. Hamilton presented uncontroverted evidence of the Commonwealth's nondisclosure of exculpatory evidence. Mr. Hamilton's case was *nolle prossed* on December 6, 2022.

19.     Mr. Hamilton's new trial motion focused on the discovery of a preliminary field report and memorandum written in 1984 by then Assistant District Attorney Robert Goodale ("Goodale Documents"), as part of his participation as a member of the "homicide response team". The preliminary field report was prepared less than twelve hours after the shooting. The memorandum, which ADA Goodale prepared for the district attorney, is dated May 29, 1984, less than a week after the incident. The Goodale Documents were withheld from defense and not previously disclosed to Mr. Hamilton until three decades after his 1987 conviction.

20.      The Goodale Documents reflected, *inter alia*, Defendant BPD Detective O'Malley's thoughts regarding Benny's credibility after interviewing him at the Area B station immediately following Efrain's shooting. ADA Goodale's preliminary field report read, "[a]s a result of this

---

[3] Trial Tr. 15:4-7, May 12, 1987.
[4] Mr. Hamilton was acquitted of the third indictment charging him with unlawfully carrying a shotgun.

interview, Detective O'Malley now believes that Benny's account of the incident is not accurate and that Benny was, in fact, involved in the distribution of cocaine."

21.     Notwithstanding doubts about Benny's credibility, and while being in possession of other *Brady* materials and facts that required disclosure under well-established constitutional principles, the evidence that tended to exculpate Mr. Hamilton and diminish his culpability was illegally withheld and not turned over to defense until decades later.

22.     The October Decision issued by Judge Squires-Lee echoes the Supreme Judicial Court's holding in *Commonwealth v. Pope*, 489 Mass. 790 (2022), evidencing that the withholding of the Goodale Documents established a substantial basis for claiming prejudice given, *inter alia*, "the potential impact of Benny's prior inconsistent statements about his girlfriend, Dickson's testimony, and [Defendant] O'Malley's statements of suspicion about Benny, [Mr. Hamilton's] specific request for exculpatory evidence, and the concomitant lower burden, and the over-all weaknesses in the Commonwealth's case …."

23.     Judge Squires-Lee's October Decision also found, "most notably, per the Goodale documents, Benny reported on the night of the shooting that only Pope confronted him with a gun and demanded money and that Hamilton allegedly remained downstairs until saying 'Let's go.' This evidence flatly contradicted Benny's trial testimony that Hamilton came upstairs and pointed a shotgun, consistent with the murder weapon, at Benny, causing Benny to identify Hamilton as the man who shot Efrain."

24.     The withholding of the exculpatory evidence detailed in the Goodale Documents and information known to Detective O'Malley and other members of BPD investigating Efrain's murder allowed the BPD to perpetuate the falsely tailored testimony of Benny and put forth a

narrative that deprived Mr. Hamilton of his constitutional right to the exculpatory evidence essential for a fair trial.

25.     For years prior to and following Mr. Hamilton's arrest and prosecution, Defendant City of Boston, BPD, and certain police officers openly deprived citizens of the Commonwealth their constitutional rights by falsifying, withholding, and destroying evidence, including but not limited to suppressing statements and/or evidence required to be disclosed to the defense, failing to properly train police officers, failing to conduct proper investigations, engaging in improperly suggestive identification procedures, fostering and encouraging untruthful testimony, and failed to discipline BPD officers who engaged in misconduct. Mr. Hamilton was deprived of his constitutional rights as a direct result of this deliberate indifference and unconstitutional policies of the Defendant City of Boston.

26.     At all relevant times, Mr. Hamilton was and maintained his innocence for the crimes for which he was indicted, ultimately convicted, and wrongfully incarcerated.

27.     Following Mr. Hamilton's arrest in 1984, he admitted to being present at 15 Nonquit Street on the date of the murder, however, he told Defendant O'Malley and investigators that Ricky Tisdale – an individual who was arrested by BPD one week after the murder in possession of the actual murder weapon ("Tisdale") – entered 15 Nonquit and in the presence of another individual shot Efrain. Tisdale died in New York City approximately a month after Efrain's murder.

28.     There was no forensic evidence linking Mr. Hamilton to the murder weapon found in the possession of Tisdale.

29.     Despite having made an arrest of the individual in possession of the murder weapon, and Mr. Hamilton's statement to Defendant O'Malley and investigators that Tisdale shot Efrain, BPD, due to a lack of proper training did not adequately investigate Tisdale's likely involvement in the

murder of Efrain. Instead, BPD continued with tunnel vision and fabricated testimony countenanced by the Defendant City of Boston to pursue an innocent man.

30.     The failure to properly investigate Tisdale's involvement in the murder of Efrain and continue to focus on and prosecute Mr. Hamilton, despite his innocence and enjoyment of the presumption of innocence, occurred due to the BPD's failure to properly train its police officers during a time when the Defendant City of Boston's policymakers were on actual and/or constructive notice that this failure and/or omission in its training program resulted in BPD violating the constitutional rights of its citizens, including Mr. Hamilton's.

31.     In addition to failing to adequately investigate the involvement of Tisdale as the person who murdered Efrain due to, *inter alia,* a "serious void" in crime scene investigation training that existed due to deliberate indifference both pre and post Efrain's murder, BPD also failed to properly and adequately investigate an individual named Ricky Veal ("Veal"), a second individual who Mr. Hamilton identified and reported to Defendant O'Malley as having been present and accompanying Tisdale at the time of the murder.[5]

32.     In September of 1984, Mr. Hamilton gave an oral statement to Defendant O'Malley. The statement was partially tape recorded.[6] In his statement, Mr. Hamilton specifically advised Defendant O'Malley that Tisdale and an individual whose last name was Veal were responsible for the murder of Efrain. BPD failed to investigate Veal, and in a written summary of Mr.

---

[5] It is apparent from an audio statement provided by Mr. Hamilton in 1984 that he advised Defendant O'Malley that the second person involved in the murder with Tisdale was named Ricky *Veal*. Transcripts of the recording and trial testimony by Defendant O'Malley reported the name as Ricky *Deal*. On information and belief, neither *Deal* nor *Veal* were investigated, leaving Mr. Hamilton to languish in prison because he was a "convenient suspect."

[6] While interrogating Mr. Hamilton in 1984 concerning the events surrounding the death of Efrain, Defendant O'Malley failed to honor Mr. Hamilton's constitutional right to cut off questioning, and the Commonwealth failed to convince the court and sustain its burden of demonstrating that "the defendant [Hamilton] waived his Fifth Amendment rights or that the defendant's right to cut off questioning was scrupulously honored" as to a portion of his statement. *Commonwealth v. Hamilton*, 411. Mass 313, 319, n. 3 (1991).

Hamilton's unrecorded statement, the second individual was identified as Ricky *Deal* rather than *Veal*. On information and belief, Veal's participation was not investigated.

33.    Mr. Hamilton was not the first individual in the city of Boston subjected to a careless investigation, erroneous prosecution, and wrongful conviction based on the Defendant City of Boston's established unconstitutional policies and procedures which permitted deliberate indifference practices regarding the training and discipline of BPD officers engaging in tolerated misconduct.

34.    Residents of Boston became aware of and subjected to the tolerated unconstitutional practices and exhibited deliberate indifference of the BPD in its investigative techniques and lack of proper training as early as 1979 from the case of Willie J. Sanders. Sanders, a black male, who had been put on trial for a series of rapes for which he maintained his actual innocence. Sanders was acquitted of the first charge in 1979. After his fourth rape case ended in acquittal in 1980, the New York Times reported an interview in which it was stated that "the police had not conducted a very serious investigation and they had come up with the handiest suspect, Willie Sanders."

35.    In November of 1980, the Massachusetts Supreme Judicial Court granted an individual named Michael Woods a new trial to resolve a question of basic fairness turning on a claim of alibi following a rape conviction. Woods, a black male, had been arrested and charged with the rape of a Boston University student that occurred while Mr. Woods was serving a term at the Deer Island House of Correction. Proper investigative training would have verified the alibi and prevented a wrongful conviction.

36.    Similarly, in 1981, Frederick Clay was convicted of first-degree murder and sentenced to life in prison without parole. In 2017, Mr. Clay's conviction was vacated based on new evidence that revealed the testimony of numerous eyewitnesses was unreliable and that Mr. Clay had been

misidentified. Specifically, one of the men who identified Mr. Clay in 1979 had done so after allegedly being hypnotized by investigators on the case. Mr. Clay, who maintained his innocence, had asserted he was not near the scene but at his foster home, an alibi which had been confirmed by his foster mother.

37.     In 1984, Mr. Ulysses Charles was convicted on three counts of rape occurring in 1980. Mr. Charles was released from prison after serving 19 years of an eighty-year sentence for a crime he did not commit. A 2005 Order from the Massachusetts Federal District in the matter of *Charles v. City of Boston*, 365 F. Supp. 2d 82 opens by stating "[p]laintiff … tells a far too familiar and tragic story." The failure to disclose exculpatory evidence and the promotion of false testimony and suggestive identification procedures indifferently condoned by the policies and practices of the City of Boston and BPD deprived Mr. Charles of the prime of his life.

38.     In 1988, Marvin Mitchell was charged with rape even though he did not fit the description of the suspect given to BPD officers. The victim described her assailant to the police as having worn pink pants, being clean-shaven and one cross-eye. Mr. Mitchell did not have a cross-eye, did have a mustache and goatee at the time of the incident, and when interrogated told police that he had been wearing gray pants on the day of the attack. Two Boston police officers falsely testified that while detained, Mr. Mitchell suddenly exclaimed he had been wearing pink pants on the day the victim was attacked. Mr. Mitchell spent over seven years in prison, before being exonerated in 1997 through DNA testing.

39.     In 1989, Shawn Drumgold was convicted of first-degree murder for the killing of a twelve-year-old girl in 1988 and sentenced to life in prison without parole. After spending over fifteen years in prison, Mr. Drumgold was released and the case against him *nolle prossed*.   Mr. Drumgold's conviction was overturned following revelations that BPD withheld exculpatory

evidence and allowed at least one witness to commit perjury before the jury, as a key witness for the Commonwealth testified during a hearing on a motion for a new trial that BPD officers had "fed him details of the crime" he otherwise would not have known to assist this witness in falsely implicating Mr. Drumgold at trial.

40.     In 1991, Boston Mayor Raymond Flynn requested a special commission (hereinafter, "the Committee") review the practices of the BPD. The report was submitted to Mayor Flynn on January 14, 1992 (hereinafter, "the St. Clair Report"). The conclusions of the St. Clair Report documented the deliberate indifference the Defendant City of Boston showed concerning BPD and its police officers and found a wide range of problems in BPD's internal affairs division.

41.     In the St. Clair Report BPD personnel publicly acknowledged that "training in the Department is inadequate." Members of the BPD acknowledged that "training for supervisors, in-service personnel, detectives, upper-level Command Staff, and field training officers was either entirely lacking or dangerously inadequate given the needs of Boston officers."

42.     With specific reference to training for detectives, the St. Clair Report stated "[t]here appears to be no special training for detectives: when patrol officers are promoted, they are simply assigned to a unit and expected to learn 'on the job.'" When they joined the unit, "[h]omicide detectives received no special training." New investigators were paired with more experienced investigators, "however, these informal training programs [were] not subject to documentation, review, or accountability."

43.     The St. Clair Report further stated "[c]urrently no training exists for upper-level management. … One officer told the committee how s/he was a supervisor one day and promoted and placed in charge of an extremely sensitive District the next day with no training or support. … This officer and others characterized the situation as extremely dangerous and one that could lead

to a major incident in the City."  "In summary, respondents voiced strong support for effective management training. Currently, the lack of such training has created serious problems with respect to both management issues within the Department and to effective delivery of police services on the street."

44.     As of 1992, officers in the BPD reported that "very few officers in the Department know how to secure a crime scene and that this sometimes results in offenders going free for lack of usable evidence."

45.     The St. Clair Report also revealed a wide range of problems in BPD's internal affairs division, including but not limited to disorganized and incomplete files, lack of documentation, and "an inappropriately restricted" investigation process attributable to "a misinterpretation of the applicable law … [which] often resulted in unnecessarily lengthy delays and a failure to investigate and impose sanctions against officers involved in the most serious misconduct."

46.     The St. Clair Report details that in the ten-year period between 1981 and 1991, complaints of alleged misconduct filed against BPD personnel increased dramatically, from 171 in 1981 to 472 in 1990.

47.     The St. Clair Report conducted an analysis of police personnel complained against, which considered in part the race of the complainant, percent of personnel with prior complaints, rank of personnel, duration of cases, and rate of sustained complaints.

48.     In conducting an analysis of the disposition of BPD internal affairs cases, the Committee took a sampling of 136 allegations which had come to a final resolution. From this sampling, the St. Clair Report found that "only 8 or 5.9% were sustained. This indicates that, in the view of the Boston Police Department, 94% of the citizens alleging police misconduct were incorrect. This

statistic strains the imagination; it assumes that more than 9 out of every 10 citizens who complain of police misconduct are mistaken or are lying."

49.     The St. Clair Report concludes its analysis of the internal affairs division by recommendations for improving the internal affairs division process while also citing to a "prominent example" of the Department's "current practice of inaction and delay" arising from the Carol Stuart homicide investigation ("Stuart Investigation"). The Committee references the United States Attorney's and Federal Bureau of Investigation's July 10, 1991, report which outlined serious misconduct by Boston Police Detectives, namely Defendant O'Malley who helped lead the Stuart Investigation. The July 10, 1991, report "'disclosed evidence of police misconduct directed against civilian witnesses, and individuals who were targets of the homicide investigation,' including 'coercion and intimidation of civilian witnesses by investigating police officers [including Defendant O'Malley] through the use of actual or implied threats of arrest, imprisonment, and physical beatings;' forcing witnesses to give false statements …, relying upon such false evidence to obtain search warrants; and 'apparent attempts to plant controlled substances in the home of witnesses.'"  More than two years after this alleged misconduct, and six months after the July 10, 1991, report, there had been no hearings, or any discipline connected to this example.

50.     As described in ¶¶ 33-49, the Defendant City of Boston and BPD's policies, customs, and practice of deliberate indifference in acquiescing, tolerating, and suppressing known violations of citizens' constitutional rights while acting under the color of law is well chronicled and aged.

51.     Despite knowledge that BPD officers felt free to circumvent the law to secure convictions, the Defendant City of Boston failed to require an adequate standard of investigation by its detectives; failed to properly supervise and review the method and process of criminal

investigations; failed to implement training programs relating to crime scene investigations and detective training; and failed to discipline Boston police officers for their obvious misconduct.

52.     The Defendant City of Boston failed to hold BPD officers to an constitutional standard, thereby creating an environment wherein officers like Defendant O'Malley[7] felt free to conduct investigations with disregard to constitutional rights and withhold and misrepresent facts without fear of discipline, as the Defendant City of Boston policymakers neither required its police officers to comply with the law nor punished them when they failed to comply with lawful procedures, all to the detriment of the citizens of Commonwealth, such as Mr. Hamilton.

53.     The known, but ignored, unlawful and unconstitutional conduct of BPD officers as described in paragraphs ¶¶ 33-49 directly caused the deprivation of Mr. Hamilton's state and federal constitutional rights. Mr. Hamilton was a victim of these well-known and tolerated unlawful practices and policies of the Defendant City of Boston.

54.     Mr. Hamilton suffered the same fate as those before and after him – he was a handy suspect that allowed BPD to pursue prosecution without conducting a reasonable investigation while respecting the constitutional rights of innocent citizens – because of the Defendant City of Boston's inadequate and deliberately indifferent training policies. The failure to have had the proper training to investigate the crime scene and involvement of Tisdale and Veal at the time of

---

[7] Defendant O'Malley has a long and well documented history of violating the constitutional rights of others, including Mr. Hamilton, and such a practice and policy has flourished for decades, both before and after Mr. Hamilton's arrest and unlawful conviction, due to the acquiescence and intentional indifference of the City and BPD policies and unethical and unconstitutional procedures. *See e.g., 2 disciplined for covering up details of detective's* beating, Boston Globe, Mar. 9, 1974, at 3 (reporting Defendant O'Malley had filed a false police report attempting to cover up a January 1974 incident in which he and his partner claimed to be attacked by a group of youths when in actuality another officer had struck and seriously injured his partner); *see also* Press Release, U.S. Department of Justice (July 10, 1991) (a report detailing the U.S. Attorney and Federal Bureau of Investigation's investigation into BPD misconduct surrounding the Carol Stuart murder investigation which was led by Defendant O'Malley, among others); *see generally, Commonwealth v. Gaines*, 240 N.E. 3d 193 (Mass. 2024).

Efrain's murder directly resulted in the unconstitutional deprivation of Mr. Hamilton's liberty for which Defendant City of Boston policymakers were directly responsible.

55.    Mr. Hamilton's convictions and lengthy unjustified incarceration directly resulted from a widespread and accepted practice and policy of the Defendant City of Boston, and the individual Defendants named herein, of fabricating evidence, coaching witnesses to testify falsely, failing to properly and honestly investigate legitimate leads and suspects, failing to properly train and supervise its police officers, covering up known misdeeds, failing to discipline officers, and withholding exculpatory evidence, all with the aim of obtaining a conviction regardless of the truth and in violation of rights secured by the United States Constitution and Massachusetts Declaration of Rights.

## *COUNT ONE*
### RELIEF PURSUANT TO 42 U.S.C § 1983
### (AGAINST THE CITY OF BOSTON)

56.    Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-55 above, and those in the pleading filed in Civil Action 1:24-CV- 10980 regarding the misconduct of the individually named Defendants and the City.

57.    At all times relevant times, the Defendant City of Boston had a constitutional duty to faithfully follow the laws of the United States and the Commonwealth of Massachusetts while conducting police activities and criminal investigations.

58.    The Defendant City of Boston was responsible for supervision, training, and discipling its employees, including those employed by the BPD.

59.    The Defendant City of Boston promulgated written and unwritten rules, policies, and procedures governing witness interviews, preparation and presentation of witness testimony, and the required disclosure of investigative materials and evidence.

60.     The Defendant City of Boston was aware of and obligated to follow lawful policies and procedures in fulfilling its constitutional duties.

61.     At all times relevant, Defendant City of Boston was on notice of a widespread practice by its officers that individuals suspected of criminal activity were regularly deprived of exculpatory evidence and subject to criminal proceedings based on intentional missing or false and fabricated physical and testimonial evidence, consequently depriving individuals of their liberty in violation of both the Massachusetts Declaration of Rights and United States Constitution.

62.     These violative widespread practices existed due to the Defendant City of Boston's deliberate indifference to the constitutional rights of the citizens that the defendants swore to protect.

63.     The policies, practices, and customs of Defendant City of Boston as described here, and as intentionally and indifferently employed in Mr. Hamilton's case, deprived Mr. Hamilton of his liberty in violation of the Massachusetts Declaration of Rights and United States Constitution.

64.     As a direct and proximate result of actions taken by officers and employees of Defendant City of Boston and the BPD, including but not limited to the individually named Defendants, Mr. Hamilton suffered injuries by those acting pursuant to the polices, practices and customs detailed above.

## **COUNT TWO**
### RELIEF PURSUANT TO 42 U.S.C § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS
### (AGAINST DEFENDANT O'MALLEY & DOES)

65.     Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-64 above.

66.    Defendants O'Malley acting individually and in concert with other Doe defendants deprived Mr. Hamilton of his constitutional right to a fair trial pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

67.    Defendant O'Malley, acting individually and in concert with other Doe defendants deprived Mr. Hamilton of his right to a fair trial by coercing false statements, fabricating inculpatory evidence, withholding both exculpatory and impeachment evidence, including, for example, Benny's evolving stories and Defendant O'Malley's disbelief in Benny's account of the incident.

68.     Defendant O'Malley acting individually and in concert with other Doe Defendants deprived Mr. Hamilton of his right to a fair trial by failing to properly and honestly investigate legitimate leads and suspects, including, for example, failing to investigate Ricky Tisdale and/or Ricky Veal.

69.    Defendant O'Malley acting individually and in concert with other Doe Defendants maliciously prosecuted Mr. Hamilton, depriving him of his constitutional right to be free from arrest without probable cause and to be free from an unreasonable search and seizure of his person pursuant to the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment.

70.    Defendant O'Malley individually and in concert with other Doe Defendants maliciously prosecuted Mr. Hamilton, depriving him of his constitutional right to due process of law pursuant to the Fourteenth Amendment.

71.    As a direct and proximate result of the actions taken by Defendant O'Malley acting individually and in concert with other Doe Defendants was wrongfully convicted and imprisoned for over seven (7) years, resulting in his suffering and continuing damages.

**\*COUNT THREE\***
**RELIEF PURSUANT TO 42 U.S.C § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS**
**(AGAINST DEFENDANTS DOES 1 THROUGH 10)**

72.     Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1- 71 above.

73.     The false arrest, malicious prosecution, wrongful conviction, and incarceration of Mr. Hamilton was caused by Does 1 through 10, supervisors of the Boston Police Department, acting collectively and in their individual capacities, who, with deliberate indifference to the rights of criminal suspects, failed to adequately, train and/or oversee defendant officers, lieutenants, and detectives in proper investigative techniques, thereby condoning, encouraging, and/or assenting to the Individual Defendants unconstitutional misconduct.

74.     Does 1 through 10, deliberately and/or recklessly, failed to properly train, oversee, and/or discipline their subordinates, thereby enabling their subordinates to engage in unconstitutional misconduct which deprived Mr. Hamilton of his constitutional rights to due process of law, right to a fair trial, and freedom from unreasonable searches and seizures.

75.     As a direct and proximate result of actions taken by Does 1 through 10, Mr. Hamilton was wrongfully convicted and unlawfully imprisoned resulting in his suffering and continuing damages.

**\*COUNT FOUR\***
**RELIEF PURSUANT TO 42 U.S.C § 1983: CIVIL RIGHTS CONSPIRACY**
**(AGAINST DEFENDANTS O'MALLEY AND DOES 1 THROUGH 10)**

76.     Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-75 above.

77.     Defendants O'Malley and Does 1 through 10, acting in concert, by agreement among themselves and with others, and with knowledge of the City of Boston, who through deliberate

indifference and tolerance of policies known to subject individual citizens to the likely deprivation of constitutional rights, deprived Mr. Hamilton of his rights to a fair trial and freedom from unreasonable searches and seizures, false arrest and imprisonment, malicious prosecution, and deprivation of liberty without due process of law pursuant to the Fourth, Fifth, and Fourteen Amendment of the United States Constitution.

78.    Defendants O'Malley and Does 1 through 10, acting in concert, by agreement among themselves and with others, prepared misleading reports, coerced and/or fabricated inculpatory testimony and withheld exculpatory and impeachment evidence.

79.    As a direct and proximate result of actions taken by Defendants O'Malley and Does 1 through 10, Mr. Hamilton was wrongfully convicted and imprisoned resulting in his suffering and continuing damages.

## *COUNT FIVE*
### STATE-LAW CLAIM OF NEGLIGENT HIRING, TRAINING, AND SUPERVISION
### (AGAINST DEFENDANT CITY OF BOSTON)

80.    Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-79 above.

81.    Defendant City of Boston is liable as a principle for all torts committed by its employees within the scope of their employment.

82.    Defendants O'Malley and Does 1 through 10, were employees, officials, and/or officers of the Defendant City of Boston and at all times relevant to the instant complaint were acting within the scope of their employment and under the color of law of the Commonwealth of Massachusetts.

83.    Defendant City of Boston had a duty to exercise reasonable care in the hiring, training, retention, supervision, and discipline of its employees, officials, and officers.

84. Defendant City of Boston breached its duty because it was aware or should have been aware of misconduct within the BPD and failed to take sufficient action to effectively train, supervise and/or discipline its employees, officials, and officers.

85. As a direct and proximate result of actions taken by Defendant City of Boston Mr. Hamilton was wrongfully convicted and imprisoned resulting in his suffering and continuing damages.

## *COUNT SIX*
### STATE-LAW CLAIM OF CIVIL CONSPIRACY
### (AGAINST DEFENDANTS O'MALLEY AND DOES 1 THROUGH 10)

86. Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-85 above.

87. Defendants O'Malley and Does 1 through 10, acting in concert, by agreement among themselves and with others, caused Mr. Hamilton to be accused, convicted, and incarcerated for crimes he did not commit.

88. Defendants O'Malley and Does 1 through 10, acting in concert, by agreement among themselves and with others, protected one another from liability for depriving Mr. Hamilton of his constitutionally protected rights.

89. The misconduct here was undertaken negligently, intentionally, with malice, and reckless disregard for the rights afforded Mr. Hamilton, and his innocence.

90. As a direct and proximate result of actions taken by Defendants O'Malley and Does 1 through 10, Mr. Hamilton was wrongfully convicted and imprisoned resulting in his suffering and continuing damages.

**\*COUNT SEVEN\***
**STATE-LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST DEFENDANTS O'MALLEY AND DOES 1 THROUGH 10)**

91.     Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-90.

92.     Defendants O'Malley and Does 1 through 10 acted intentionally to cause Mr. Hamilton to be charged, convicted, and incarcerated.

93.     The actions, omissions, and conduct exhibited by Defendants O'Malley and Does 1 through 10 as detailed herein were extreme, outrageous, and intended to cause severe emotional distress and did in fact cause emotional distress upon Mr. Hamilton.

94.     As a direct and proximate result of the actions taken by Defendants O'Malley and Does 1 through 10, Mr. Hamilton suffered and continues to suffer emotional distress and damages.

**\*COUNT EIGHT\***
**STATE-LAW CLAIM OF NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST DEFENDANTS O'MALLEY AND DOES 1 THROUGH 10)**

95.     Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-94 above.

96.     Defendants O'Malley and Does 1 through 10, owed Mr. Hamilton a duty to conduct a legal, thorough, and comprehensive investigation into the murder of Efrain in order to accurately identify, arrest, and prosecute the guilty assailant(s).

97.     Defendants O'Malley and Does 1 through 10 also owed Mr. Hamilton a duty to refrain from erroneously accusing him of crimes he did not commit.

98.     Defendants O'Malley and Does 1 through 10, breached their duty to Mr. Hamilton by the actions, omissions, and conduct described herein.

99.    The actions, omissions, and conduct of Defendants O'Malley and Does 1 through 10, were objectively unreasonable.

100.    It was reasonably foreseeable that the actions, omissions, and conduct of Defendants O'Malley and Does 1 through 10 would cause a reasonable person, including Mr. Hamilton, emotional distress.

101.    As a direct and proximate result of the actions taken by Defendants O'Malley and Does 1 through 10, Mr. Hamilton suffered and continues to suffer emotional distress.

### *COUNT NINE*
**STATE-LAW CLAIM OF MALICIOUS PROSECUTION**
**(AGAINST DEFENDANTS O'MALLEY AND DOES 1 THROUGH 10)**

102.    Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1- 101 above.

103.    Defendants O'Malley and Does 1 through 10, under the color of laws of the Commonwealth of Massachusetts, caused criminal proceedings to be instituted against Mr. Hamilton without probable cause and with malice.

104.    Defendants O'Malley and Does 1 through 10's actions, omissions, and conduct were willful and with reckless disregard for Mr. Hamilton's rights, and blatantly unreasonable.

105.    All proceedings against Mr. Hamilton terminated in his favor when his sentence was vacated and all proceedings against him *nolle processed* in December of 2022.

106.    As a direct and proximate result of actions taken by Defendants O'Malley and Does 1 through 10 Mr. Hamilton was wrongfully prosecuted, convicted and imprisoned resulting in his suffering and continued damages.

## *COUNT TEN*
### STATE-LAW CLAIM OF *RESPONDEAT SUPERIOR*
### (AGAINST DEFENDANT CITY OF BOSTON)

107.    Pursuant to Fed. R. Civ. P. 10(c), the Plaintiff adopts by reference the allegations set forth in ¶¶ 1-104 above.

108.    Defendants O'Malley and Does 1 through 10, committed the misconduct alleged in the proceeding paragraphs as employees, officials, and officers for the City of Boston.

109.    At all times relevant Defendants O'Malley and Does 1 through 10 acted within the scope of their employment and carried out unconstitutional policies and procedures of the City of Boston.

110.    Defendant City of Boston is liable as a principal for torts committed by their employees, officials, and officers, acting in the scope of their employment.

## PRAYERS FOR RELIEF

Wherefore, Plaintiff Albert Brown, otherwise known as Floyd Hamilton, demands judgement jointly and severally against all Defendants as follows:

a.    The Court award compensatory damages to him against the Defendants, jointly and severally, in an amount to be determined at trial;

b.    The Court award punitive damages to him, and against Defendants, in an amount that will deter such conduct by Defendants in the future to be determined at trial;

c.    Pre-Judgement and post-judgement interest and recover of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

d.    For any and all relief to which he may be entitled and that this Honorable Court deem just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(a), the Plaintiff, Mr. Hamilton, hereby demands a trial by jury on all claims and issues so triable.


Dated: 10/23/24

Respectfully submitted,
For the Plaintiff
By His Attorneys,

*/s/  Frank C. Corso, Esq.*
*/s/  Paolo G. Corso, Esq.*
Frank C. Corso, Esq. (BBO#545552)
Paolo G. Corso, Esq. (BBO#703315)
Corso Law, LLC
492 Winthrop Street, Suite 5
Rehoboth, MA 02769
Tel: 774-901-2677
Fax: 774-901-2678
fcc@corsolaw.com
pgc@corsolaw.com