UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALBERT BROWN O/K/A FLOYD HAMILTON, | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | No. 1:24-cv-12687-JEK |
| CITY OF BOSTON, PETER O'MALLEY, and DOES 1-10, | ) ) ) ) |  |
| Defendants. | ) ) |  |

**MEMORANDUM AND ORDER ON DEFENDANT
CITY OF BOSTON'S PARTIAL MOTION TO DISMISS**

**KOBICK, J.**

Plaintiff Albert Brown, otherwise known as Floyd Hamilton,[1] was incarcerated for the murder of Efrain DeJesus for over thirty years until his conviction was overturned in 2022 based on the discovery of exculpatory evidence that had been withheld from his defense. Hamilton now sues the City of Boston, a Boston Police Department ("BPD") detective named Peter O'Malley, and Does 1 through 10 of the BPD for their role in his arrest and prosecution. In addition to his claims against the other defendants, Hamilton asserts that the City violated 42 U.S.C. § 1983 by depriving him of his constitutional rights; engaged in negligent hiring, training, and supervision; and is responsible for its officers' actions under a *respondeat superior* theory of liability.

Pending before the Court is the City's partial motion to dismiss the section 1983 and *respondeat superior* claims against it. For the reasons that follow, the motion will be granted with respect to the *respondeat superior* claim but denied as to the section 1983 claim. Hamilton fails to

---

[1] Consistent with the complaint, the Court will refer to the plaintiff throughout as "Hamilton."

allege sufficient facts to support a *respondeat superior* claim cognizable under Massachusetts law. He has, however, adequately alleged a section 1983 claim against the City for having a policy that permitted BPD officers to withhold and fabricate evidence and for failing to train, supervise, or discipline those officers on preventing the suppression and fabrication of evidence.

## BACKGROUND

**I.    Factual Background.**

The following facts, drawn from the complaint, are accepted as true for purposes of the partial motion to dismiss. *Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13, 18 (1st Cir. 2024).

**A.    The Conviction and Nondisclosure of Exculpatory Evidence.**

In May 1987, Hamilton was convicted of first-degree murder and armed robbery for the May 23, 1984 fatal shooting of Efrain DeJesus in the Dorchester neighborhood of Boston. ECF 1, ¶¶ 10, 17. Hamilton was sentenced to life in prison without the possibility of parole. *Id.* ¶ 17. At trial,[2] the prosecution relied heavily on the testimony of Efrain's brother, Benny DeJesus, to link Hamilton to the murder. *Id.* ¶ 13. Benny, who lived with Efrain at the time, testified that he saw Efrain in their house with Hamilton and Hamilton's co-defendant, Joseph Pope. *Id.* ¶¶ 13-14.[3] Benny also testified that, while in another room of the house, he overheard Efrain say, "'Oh no not this. You are going to have to shoot,'" and then heard a commotion and a gunshot. *Id.* ¶ 15. Benny further testified that he then ran into Pope, who robbed him at gunpoint, and Hamilton, who knelt

---

[2] This was his third trial, after the first two trials resulted in a hung jury and a mistrial, respectively. ECF 1, ¶ 12 n.2.

[3] In addition to the facts alleged in the complaint, Hamilton seeks to "adop[t] by reference the allegations set forth" in Pope's contemporaneous complaint against the City. ECF 1, ¶ 56; *see* ECF 1, *Pope v. City of Bos.*, No. 24-cv-10980-DJC (D. Mass. Apr. 17, 2024). Because Federal Rule of Civil Procedure 10(c) does not appear to permit him to "adopt other pleadings from a wholly separate action," Hamilton's complaint cannot incorporate the allegations in the *Pope* complaint. *Aronson v. Advanced Cell Tech., Inc.*, 972 F. Supp. 2d 123, 136 (D. Mass. 2013) (quotation marks omitted).

and pointed a shotgun at Benny. *Id.* Benny identified Hamilton in court as the person who pointed the shotgun at him and who shot his brother. *Id.* ¶ 16. Despite his conviction, Hamilton maintained his innocence throughout the more than thirty years he spent in prison. *Id.* ¶ 26.

In June 2022, the Supreme Judicial Court ordered a retrial of Pope because the Commonwealth had improperly withheld exculpatory evidence from him. *Commonwealth v. Pope*, 489 Mass. 790, 805 (2022).[4] Four months later, the Superior Court granted Hamilton's motion for a new trial because the Commonwealth had failed to disclose the same exculpatory evidence to him. ECF 1, ¶ 18. That evidence included then Assistant District Attorney Robert Goodale's preliminary field report prepared within twelve hours of Efrain's shooting and his memorandum written six days after the shooting. *Id.* ¶ 19. Those improperly withheld materials indicated, among other things, that Detective O'Malley, a defendant here, doubted Benny's credibility and that Benny made statements to the police the night of the shooting that contradicted his trial testimony that Hamilton had pointed a shotgun at him. *Id.* ¶¶ 20, 22-23. BPD also allegedly failed to properly investigate Ricky Tisdale or Ricky Veal after Hamilton told them, following his arrest in 1984, that Tisdale entered the DeJesus house with Veal and shot Efrain. *Id.* ¶¶ 27, 29, 31-32. The Commonwealth declined to reprosecute Hamilton in December 2022. *Id.* ¶ 18.

B.    BPD's Alleged Pattern of Mishandling Evidence.

Hamilton further alleges that, before and after his 1984 arrest and 1987 conviction, the City and BPD had a pattern of "falsifying, withholding, and destroying evidence, including but not limited to suppressing statements and/or evidence required to be disclosed to the defense, failing to properly train police officers, failing to conduct proper investigations, engaging in improperly

---

[4] "[L]aw enforcement officers have a . . . duty to turn over to the prosecutor any material evidence that is favorable to a defendant," including evidence that "is either exculpatory or impeaching in nature." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013).

3

suggestive identification procedures, fostering and encouraging untruthful testimony, and fail[ing] to discipline BPD officers who engaged in misconduct." *Id.* ¶ 25. To support this assertion, the complaint describes six allegedly flawed criminal investigations by BPD between 1979 and 1989. *See id.* ¶¶ 34-39. For example, Ulysses Charles, who was convicted of rape in 1984, had his conviction overturned after BPD withheld exculpatory evidence and promoted false testimony. *Id.* ¶ 37. Shawn Drumgold, who was convicted of first-degree murder in 1989, similarly had his conviction overturned because BPD failed to disclose exculpatory evidence and "'fed'" information about the crime to a key witness. *Id.* ¶ 39.

The complaint also highlights the St. Clair Report from January 1992, which assessed BPD's practices at the Mayor of Boston's request. *Id.* ¶ 40. The Report documented BPD's "'inadequate'" training at all levels, including detectives and supervisors, and explained that "'very few officers in the Department kn[ew] how to secure a crime scene.'" *Id.* ¶¶ 41-44. It noted that BPD's internal files were disorganized and found "'an inappropriately restricted' investigation process" that "'often resulted in . . . a failure to investigate and impose sanctions against officers involved in the most serious misconduct.'" *Id.* ¶ 45. It calculated that only 5.9% of complaints against BPD were sustained, which, it concluded, "'strain[ed] the imagination.'" *Id.* ¶ 48. And it referenced a July 1991 federal investigation of BPD's handling of the homicide of Carol Stuart, which found that BPD officers, including Detective O'Malley, engaged in misconduct by coercing and intimidating witnesses, forcing witnesses to make false statements, and using false evidence to obtain search warrants. *Id.* ¶ 49. Detective O'Malley also allegedly filed a false police report in 1974 to cover up his partner's beating by another officer. *Id.* ¶ 52 n.7.

4

II.     **Procedural History.**

Hamilton initiated this action in October 2024 asserting ten claims. ECF 1. He alleges that the City deprived him of his constitutional rights, in violation of 42 U.S.C. § 1983 (Count One); engaged in negligent hiring, training, and supervision, in violation of state law (Count Five); and is answerable for the actions of its BPD officers under a *respondeat superior* theory of liability (Count Ten). *Id.* ¶¶ 56-64, 80-85, 107-10. Against Detective O'Malley and the BPD Does, Hamilton asserts section 1983 claims for violating his Fourth and Fourteenth Amendment rights and engaging in a civil rights conspiracy (Counts Two and Four, respectively) as well as state-law claims for civil conspiracy (Count Six), intentional and negligent infliction of emotional distress (Counts Seven and Eight, respectively), and malicious prosecution (Count Nine). *Id.* ¶¶ 65-71, 76-79, 86-106. He also asserts a separate section 1983 claim against only the BPD Does (Count Three). *Id.* ¶¶ 72-75.

The City filed a partial motion to dismiss Counts One and Ten under Federal Rule of Civil Procedure 12(b)(6). ECF 7. After Hamilton opposed that motion, the Court held a hearing and took the motion under advisement. ECF 9, 12.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## DISCUSSION

### I.      Section 1983 Claim.

Count One asserts that the City violated 42 U.S.C. § 1983 by depriving Hamilton of his constitutional rights. ECF 1, ¶¶ 56-64. Hamilton's section 1983 claim is premised on two distinct theories: (1) the City had a policy that allowed BPD officers to regularly withhold and fabricate evidence, and (2) the City failed to properly train, supervise, or discipline the officers to prevent their suppression and fabrication of evidence. *Id.* ¶¶ 25, 50, 58, 61. These theories "each deman[d] a different kind of proof." *Haley v. City of Bos.*, 657 F.3d 39, 51 (1st Cir. 2011).

With respect to Hamilton's first theory, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue" because "*[r]espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978)). A plaintiff must, therefore, "prove that 'action pursuant to official municipal policy' caused [his] injury." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (quoting *Monell*, 436 U.S. at 691). Such a policy includes "practices so persistent and widespread as to practically have the force of law." *Id.* at 61. Instructive here, the plaintiff in *Haley v. City of Boston* alleged that he was wrongfully convicted due to BPD detectives' improper withholding of two witnesses' exculpatory statements "pursuant to a standing BPD policy," whereby "Boston police officers regularly kept helpful evidence from criminal defendants," in an effort "to encourage successful prosecutorial outcomes despite the existence of evidence pointing to innocence." 657 F.3d at 52. The First Circuit relied upon "the volume of cases involving nondisclosure of

exculpatory information and the instant failure to disclose statements that clearly would have undermined the prosecution's theory of the case" to conclude that the plaintiff had sufficiently pleaded "an unconstitutional policy." *Id.* at 52-53.

The complaint here, too, plausibly alleges that "Hamilton suffered injuries" from the City's "widespread practice by its officers that individuals suspected of criminal activity were regularly deprived of exculpatory evidence and subject to criminal proceedings based on intentional missing or false and fabricated physical and testimonial evidence." ECF 1, ¶¶ 61, 64. Like the plaintiff in *Haley*, Hamilton was wrongfully convicted based on BPD's failure to disclose exculpatory evidence, namely, evidence that Benny made prior inconsistent statements and Detective O'Malley doubted Benny's credibility. *Id.* ¶¶ 20, 22-23, 33. Beyond these allegations "couched in *general* terms," *Haley*, 657 F.3d at 53 (emphasis added), the complaint also identifies *specific* violations by BPD before, during, and after Hamilton's 1984 investigation and 1987 conviction, *see* ECF 1, ¶¶ 33-49. For instance, the 1984 and 1989 convictions of Ulysses Charles and Shawn Drumgold, respectively, were overturned in part because BPD allegedly withheld exculpatory evidence and promoted false witness testimony. *Id.* ¶¶ 37, 39. The 1992 St. Clair Report similarly documented how BPD officers, including Detective O'Malley, intimidated witnesses, forced them to make false statements, and fabricated evidence. *Id.* ¶ 49. Detective O'Malley also allegedly filed a false police report in 1974 to cover up that another officer beat up his partner. *Id.* ¶ 52 n.7. These "allegations paint an ugly but plausible picture" of the City's "unconstitutional policy." *Haley*, 657 F.3d at 52; *accord Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 403-04 (4th Cir. 2014) (adopting *Haley*'s reasoning in holding that plaintiff's section 1983 claim survived dismissal).

In the City's view, these allegations fail to establish a widespread pattern sufficient to place it on notice of BPD's constitutional violations. The City argues that none of the six individual cases

cited in the complaint involved Detective O'Malley or any other officer involved in the Efrain DeJesus shooting. ECF 8, at 10-11; *see* ECF 1, ¶¶ 34-39. But, as explained, Detective O'Malley's alleged misconduct is highlighted in the St. Clair Report, and he reportedly filed a false police report over a decade before BPD's investigation of Hamilton. The City also points out that some, but not all, of the events in the St. Clair Report took place *after* the Efrain investigation. "Post-event evidence can shed some light," however, "on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989). Even though, for example, the conviction of Ulysses Charles was not overturned until 2005, BPD's failure to disclose exculpatory evidence occurred when he was convicted in 1984, three years before Hamilton's conviction. ECF 1, ¶ 37. Shawn Drumgold's conviction in 1989 was overturned in the 2000s for similar reasons. *Id.* ¶ 39. The St. Clair Report likewise surveyed complaints against BPD between 1981 and 1991 and discussed officer misconduct, including the manufacturing of evidence, around this same time period. *Id.* ¶¶ 46, 49. BPD's alleged conduct both before and after Hamilton's conviction supports the plausible inference that the City had an unconstitutional policy to withhold exculpatory evidence when Hamilton was investigated and convicted of Efrain's murder. *See Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) (permitting admission of "actions taken subsequent to an event" where "they provide[d] reliable insight into the policy in force at the time of the incident"). Indeed, this Court recently held that similar allegations by Hamilton's co-defendant, Joseph Pope, that Detective "O'Malley engaged in falsification of evidence, coercion of witnesses and untruthful testimony both pre-dating and post-dating Pope's investigation, arrest and conviction" established "a plausible pattern and practice widespread enough to plausibly put the City on notice of [the] same." *Pope v. City of Bos.*, No. 24-cv-10980-DJC, 2024 WL 4712857, at *4 (D. Mass. Nov. 7, 2024).

Turning to Hamilton's second theory, "'[t]riggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies.'" *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025) (quoting *Cosenza v. City of Worcester*, 120 F.4th 30, 38 (1st Cir. 2024)). "Typically, '[a] pattern of similar constitutional violations by untrained employees' is necessary to demonstrate deliberate indifference." *Cosenza*, 120 F.4th at 38 (quoting *Connick*, 563 U.S. at 62). But "in very rare cases," such a pattern "may not be needed so long as the violation . . . is a highly predictable consequence of a failure to equip [governmental actors] with specific tools to handle recurring situations." *Wadsworth*, 129 F.4th at 68 (quotation marks omitted). Instructive once again, the plaintiff in *Haley* alleged that "BPD's unconstitutional suppression of the [witnesses'] statements, if not the result of a standing policy, was precipitated by poor training, to which the City was deliberately indifferent." 657 F.3d at 52. The First Circuit held that the plaintiff sufficiently stated a claim that the City "turned a blind eye to the need for training," in part because BPD's failure to disclose those exculpatory statements was "wholly unexplained" and such "disclosure abuses [were] a recurring problem in criminal cases." *Id.* at 52-53.

This complaint likewise adequately alleges that the City "fail[ed] to properly train officers" regarding crime scene investigations and detective training and that, "due to [that] lack of proper training," the "BPD continued with tunnel vision and fabricated testimony" and "withh[eld] and misrepresent[ed] facts" to pursue Hamilton, "an innocent man," in violation of his constitutional rights. ECF 1, ¶¶ 25, 29-30, 51-52. As discussed, the complaint details six other cases between 1979 and 1989 where BPD engaged in "careless investigation[s]" because of inadequate training. *Id.* ¶¶ 33-39. Those cases, particularly of Ulysses Charles and Shawn Drumgold, reveal a "pattern

of *similar* constitutional violations" involving BPD's nondisclosure of exculpatory evidence and fabrication of evidence in the 1980s. *Connick*, 563 U.S. at 62 (emphasis added); *see* ECF 1, ¶¶ 37, 39. The St. Clair Report from 1992 also repeatedly stated that BPD's training was "'inadequate'" across the board—for officers, detectives, and supervisors alike. ECF 1, ¶¶ 40-44. These allegations, taken together, permit the plausible inference that the City failed to adequately train BPD officers regarding fabrication of evidence and the mandatory disclosure of exculpatory information. *See Pope*, 2024 WL 4712857, at *3-4 (finding plausible failure to train claim based on similar allegations).

In sum, Hamilton has sufficiently stated a section 1983 claim against the City based on its allegedly unconstitutional policy and purported failure to properly train BPD officers. The City's motion to dismiss this Count will, accordingly, be denied.

## II.     *Respondeat Superior* Claim.

Count Ten asserts a claim of *respondeat superior* against the City under the Massachusetts Tort Claims Act ("MTCA"), M.G.L. c. 258. ECF 1, ¶¶ 107-10.[5] The complaint alleges that the City "is liable as a principal for torts committed by [its] employees, officials, and officers, acting in the scope of their employment." *Id.* ¶ 110. "The MTCA waives the governmental immunity that 'public employers' have against tort liability for the 'negligent or wrongful' conduct of their employees done 'while acting within the scope of [their] office or employment.'" *FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n*, 489 Mass. 702, 718 (2022) (quoting M.G.L. c. 258, § 2). Section 10(c) of the MTCA, however, preserves municipal immunity for "any claim arising out of an intentional tort, including . . . malicious prosecution." M.G.L c. 258, § 10(c); *see*

---

[5] Count Ten does not expressly identify the MTCA, but the parties agreed at the motion hearing that this claim is governed by the MTCA.

*Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 284 (1985) ("There is no case law in this Commonwealth holding municipalities liable for the intentional torts of their employees."). And section 10(h) exempts municipalities from liability for "any claim based upon the failure to . . . investigate . . . crimes." M.G.L c. 258, § 10(h).

The parties agree that, under sections 10(c) and 10(h) of the MTCA, respectively, the City is not liable for its employees' intentional torts or their negligent failure to adequately investigate or identify suspects. *See* ECF 8, at 15-16; ECF 9, at 9.[6] Hamilton nevertheless argues that the City can be held liable for officer misconduct not covered by either section "[t]o the extent the conduct alleged was negligent, wrongful, or reckless, and contributed to [his] injuries." ECF 9, at 9-10. At the hearing, however, Hamilton's counsel conceded that the *respondeat superior* claim is not premised on negligent hiring, training, or supervision because that would be duplicative of Count Five. Counsel also clarified that this claim is based on other negligent acts by the defendants, such as failing to turn over exculpatory documents. But the complaint does not allege facts to support a theory that the defendants withheld exculpatory evidence *negligently*. To the contrary, it asserts that BPD intentionally "suppress[ed] statements and/or evidence" "to perpetuate the falsely tailored testimony of Benny and put forth a narrative that deprived Mr. Hamilton of his constitutional right to the exculpatory evidence." ECF 1, ¶¶ 24-25. Because Hamilton fails to allege

---

[6] Because Hamilton "concedes" that section 10(h) covers BPD's allegedly negligent investigation, the Court does not address the merits of the parties' interpretation of that provision. ECF 9, at 9; *see Carleton v. Town of Framingham*, 418 Mass. 623, 629 (1994) ("[C]lause (h) seeks to immunize a municipality when the criminal acts of a *third person* are a cause of a plaintiff's harm, and the police were negligent in not preventing that criminal conduct." (emphasis added)); *compare Anderson v. City of Gloucester*, 75 Mass. App. Ct. 429, 431, 434 n.10 (2009) (finding it "conceivable . . . that § 10(h) [was] broad enough to immunize" the municipality from its officer's negligent misidentification of the victim but recognizing that this activity did "not fit easily into the statutory shelter [of] § 10(h)"), *with Rivera v. City of Worcester*, No. 12-cv-40066-TSH, 2012 WL 5354153, at *4 (D. Mass. Oct. 26, 2012) (rejecting application of section 10(h) where plaintiff "challeng[ed] whether the Officers acted negligently during their investigation").

any *respondeat superior* theory that falls outside of the purview of sections 10(c) and 10(h) of the MTCA or is not otherwise covered by Count Five, Count Ten will be dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, the City of Boston's partial motion to dismiss, ECF 7, is GRANTED with respect to Count Ten but DENIED as to Count One.

SO ORDERED.

Dated: August 21, 2025

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE